## THE STATE OF KANSAS v. THE REPUBLICAN RIVER BRIDGE COMPANY.

1. MANDAMUS; *Mere Contract Obligations.* Obligations arising upon contract merely, and involving no trust, cannot be enforced by mandamus.

2. ———— A Bridge Company was organized and chartered to erect a toll-bridge over the Republican river, on the public highway leading from Fort Riley to Junction City, in the county of Davis, under "an act to enable the trustees of colleges, academies, universities, and other institutions, societies, and companies, to become bodies corporate," approved 9th February 1859. Said Bridge Company thereafter accepted the terms and conditions of the act of the legislature of 26th February 1867, accepting a certain grant of land from the United States to the state of Kansas for bridge purposes, and authorizing said Bridge Company to construct such bridge, and thereafter completed the bridge as

provided in said act, and at once notified the governor of Kansas that the bridge had been completed. The governor examined and accepted the bridge, and the company thereupon deposited with the governor satisfactory surety and guaranties to the state, fully indemnifying it against any loss or losses by reason of the guaranty given by the state of Kansas to the United States, and received a patent for the four thousand acres of land granted to the state of Kansas to aid in the construction of a bridge over the Republican river. *Held*, That when the company thereafter allows and suffers said bridge to decay and fall into the river, and become unfit for use, the state of Kansas cannot compel the company to rebuild, keep up, and maintain forever the said bridge, by a writ of mandamus.

3. ———— The remedy which the state has, if any exists, is by an action upon the surety and guaranties taken and accepted from the company to fully indemnify the state from all loss.

### Original Proceedings in Mandamus.

MANDAMUS, to compel the *Republican River Bridge Company* to rebuild and maintain a certain bridge across the Republican river. Said *Bridge Company* was organized in 1864. The charter, as filed in the office of the secretary of state, 11th November 1864, (omitting the certificate of acknowledgment of the execution thereof,) is as follows:

THE UNDERSIGNED hereby certify, that they have this day associated themselves into a Bridge Company, under the act of the Legislature of the State of Kansas, entitled "An act to enable the trustees of colleges, academies, universities, and other institutions, societies, and companies to become bodies corporate," approved February 9th 1859, to be known as the "Republican River Bridge Company;" that the object for which said company is formed is the erection of a toll-bridge over the Republican river, on the public highway leading from Fort Riley to Junction City, in the county of Davis and State of Kansas; that the capital stock of said company shall be thirty thousand dollars, divided into shares of fifty dollars each.

In witness whereof, we have hereunto subscribed our names, and affixed our seals, this 5th of November 1864.  ROBERT MCBRATNEY. [L.S.]
   P. Z. TAYLOR.    [L.S.]    DANIEL MITCHELL. [L.S.]
   WM. K. BARTLETT. [L.S.]    GUERDON E. BEATES. [L.S.]

Thereafter the corporators aforesaid opened the books of the said Republican River Bridge Company for subscription to the capital stock thereof, and the following-named persons susbcribed to the capital stock of said company, and became stockholders and members thereof, to-wit: James Streeter, S. M. Strickler, Hiram F. Hale, William S. Blakely, E. S.

Stover, A. W. Callen, James M. Harvey, J. H. Gillpatrick, S. D. Houston, Thos. L. Price, Jas. H. Seger, and others unknown.

On the 2d of March 1867, the following joint resolution of congress was passed and approved, to-wit:

A JOINT RESOLUTION for the Reduction of the Military Reservation of Fort Riley, and to grant Land for Bridge purposes to the State of Kansas.

*Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the southwestern boundary of the military reservation of Fort Riley, in the state of Kansas, be, and the same is hereby, declared to be, hereafter, the channel of the Republican river, from its mouth to the point where said river intersects the present western line of said reservation; and the land leased from said reservation and lying between the Smoky Hill and Republican rivers, is hereby granted to the state of Kansas to aid in the construction of a bridge over the Republican river, on the public highway leading through the present reservation; but upon the express condition, that this grant shall be accepted by the state of Kansas, with a guaranty given by said state, by an act of the legislature thereof, that said bridge shall be kept up and maintained in good condition, and shall be free to the use of the government of the United States, for all transit purposes, forever, without tolls or charges; and on such acceptance and guaranty being filed in the office of the Secretary of the Interior, together with the certificate of the governor of Kansas that a good and permanent bridge has been constructed over the said Republican river, it shall be the duty of said secretary to issue patent, for the land hereby granted, to the state of Kansas, or to such company as may be authorized by act of the legislature of said state to construct said bridge: *Provided however,* That nothing herein contained shall be construed to interfere with any grant of any part of said land heretofore made by the United States.

While said joint resolution was pending in congress, and before its final passage and approval, the legislature of Kansas passed the following act:

CH. 34, LAWS OF 1867.—AN ACT accepting a certain grant of land from the United States to the state of Kansas for bridge purposes, and authorizing the Republican River Bridge Company to construct such bridge.

*Be it enacted by the Legislature of the State of Kansas,* That the joint resolution passed by the congress of the United States at the 39th session thereof, and entitled "A joint resolution for the reduction of the military reservation of Fort Riley, and to grant land for bridge purposes to the state of Kansas," be and the same hereby is accepted by the state of Kansas, upon the terms and conditions therein named; and the guaranty therein required, "that a bridge shall be constructed over the Republican river on the public highway leading through the present Fort Riley military reservation, and that said bridge shall be kept up and maintained in good condition, and shall be free to the use of the government of the United States, and the citizens of the state of Kansas, for all transit purposes forever, without tolls or charges," is hereby given.

SEC. 2. The Republican River Bridge Company, of Davis county, whose certificate of incorporation was, on the 11th day of November 1864, filed in the secretary of state's office, is hereby authorized and empowered to proceed under its charter to construct said bridge.

SEC. 3. It shall be the duty of said Republican [River] Bridge Company to complete said bridge within one year from the date of the passage and approval of this act; and immediately after the completion of said bridge, it shall be the duty of said bridge company to notify the governor of this state that such bridge has been completed, whereupon, within ten days after receiving such notice, the governor shall in person, together with a competent engineer, proceed to examine said bridge; and if upon such examination the governor shall find that a good and permanent bridge has been by said Republican River Bridge Company constructed over the said Republican river, it shall be his duty, within ten days thereafter, to certify the same to the Secretary of the Interior, which certificate, together with a certified copy of this act, shall be by the governor transmitted to the Secretary of the Interior, at Washington, D. C., for the purpose of having [the] same filed in his office; and the governor shall, at the time of transmitting said certificate and copy of this act, also transmit to the Secretary of the Interior a request that he issue patent for the land mentioned and described in the joint resolution of congress referred to in the first section of this act, to said Republican River Bridge Company.

SEC. 4. Before the governor shall make request to the Secretary of the Interior to issue patent to said land, to said Republican River Bridge Company, as provided in the preceding section 3, said Republican River Bridge Company shall deposit with the governor satisfactory surety and guaranties, fully indemnifying the state of Kansas against any loss or losses by reason of the guaranty herein given by the state of Kansas to the United States.

SEC. 5. This act shall take effect and be in force from and after its passage, and publication in the Leavenworth *Evening Bulletin.*

Approved February 26, 1877:          S. J. CRAWFORD, *Governor.*

The information for the alternative writ of mandamus, alleged, among other matters, that said *Bridge Company* "accepted from the state of Kansas the said grant of land, with all the conditions which the United States imposed upon the state of Kansas," and "deposited with the governor of the state of Kansas satisfactory surety and guaranties, fully indemnifying the state of Kansas against any loss or losses by reason of the guaranties given by the state of Kansas to the United States; that it thereby became the duty of said *Bridge Company* to construct said bridge over the said Republican river, in compliance with the conditions named and the guaranties required from the state by the said joint resolution, to-wit, that the said bridge should be constructed, kept up, and maintained in good condition, etc., forever;" that said *Bridge Company* did thereupon construct said bridge as required by law, and said bridge was duly inspected, examined, and accepted by S. J. Crawford, governor of the state of Kansas, on the 20th of December 1867; that said *Bridge*

*Company* deposited with the governor a bond executed by certain sureties, and then and there became obligated "to keep up and maintain said bridge in good condition forever, and to fully indemnify the said state of Kansas against any loss or losses by reason of the guaranty given by the said state of Kansas to the United States;" that by reason of the premises said *Bridge Company* "became entitled to receive a patent, and did receive and accept a patent from the United States" for about 4,000 acres of land so as aforesaid granted to the state for bridge purposes, "and it thereby became the duty of said company to keep up and maintain said bridge in good condition and repair forever;" that said company "has neglected, failed, and omitted to keep up and maintain said bridge in good condition and repair, but has allowed and suffered said bridge to rot and decay, and to become unsafe and useless, and for a long time dangerous, and that said bridge did finally give way and fall into the river, a total wreck, on the 20th of August 1877;" and that said company "has failed, neglected and omitted to reconstruct and rebuild said bridge, and the said bridge is now a total wreck, and wholly unfit for use."

The lands patented to the *Bridge Company* were divided up and sold to *bona fide* purchasers. The corporation became insolvent; the bond became worthless as a security; and in 1877 the bridge fell into the river and became a wreck. The official authorities of the United States reminded the governor of the state of Kansas of the legislative guaranty of 1867, and demanded that the bridge should at once be repaired and put in condition for transit purposes. The governor notified the company of the demand of the United States, and the company failing to take any steps to comply with this request, this action was brought by the attorney-general.

An alternative writ of mandamus was issued, commanding and requiring the *Bridge Company* "immediately to rebuild and reconstruct said bridge, and to have it completed by the the 25th of October 1877, and to thereafter keep up said

bridge, and maintain it in good repair forever," or to show cause on the 24th of November 1877, at 10 o'clock A.M. of said day, why it has not done so. On the return-day of said writ the defendant appeared and filed the following motion to quash said writ:

(*Title.*) "Now comes the defendant in the above-entitled case, and moves the court to quash the alternative writ of mandamus issued therein, on the ground that the facts stated in said alternative writ are not sufficient in law to constitute a cause of action against said defendant."

The case was heard at the January Term 1878 of this court, and the subjoined opinion was filed on the 19th of June 1878.

*Willard Davis*, attorney-general, and *H. B. Johnson*, for The State.

*Gillpatrick & Taylor*, *McClure & Humphrey*, and *James Ketner*, for defendant.

The opinion of the court was delivered by

HORTON, C. J.: On the 25th of September 1877, this court, upon the motion of Hon. Willard Davis, the attorney-general for the state, allowed an alternative writ of mandamus against the Republican River Bridge Company, of Davis county, commanding the company to reconstruct a bridge built in 1867 over the Republican river, on the public highway leading from Fort Riley to Junction City, in Davis county, or show cause why it had not done so. On the return of the process the defendant appeared, and moved to quash the writ, on the ground that the facts stated therein were not sufficient in law to constitute a cause of action against the company. The writ recited the original charter of the company, filed in the office of the secretary of state on November 11th 1864, and which set forth that the object for which the company was formed was the erection of a toll-bridge over the Republican river at the place above named; the joint resolution of congress, of 2d March 1867, releasing

27—20 KAS.

from the military reservation at Fort Riley all that part of the reserve lying and being between the Republican and Smoky Hill rivers, to-wit, about 4,000 acres of land, and granting the same to the state of Kansas to aid in the construction of a bridge over the Republican river, on the public highway leading through the reservation, upon the condition that the grant should be accepted by the state, with a guaranty given, by an act of the legislature, that the bridge should be *kept up* and maintained in good condition, and be free to the use of the government of the United States for all transit purposes *forever, and without tolls or charges;* the special law of the legislature of 26th February 1867, accepting the grant of congress, obligating the state to comply with the terms of the joint resolution, and authorizing the bridge company to proceed under its charter to construct the bridge; that by said act of February 26th it became the duty of the company to complete the bridge within one year from the approval of the same, and deposit with the governor satisfactory surety and guaranties to fully indemnify the state against any loss or losses by reason of the guaranty given by the state to the United States, and its right to receive therefor a patent for all said lands so released from the military reservation and granted to the state. The writ further recited, that the bridge company accepted from the state the grant of land; that it constructed the bridge as required by the act of February 26th 1867; that it gave its guaranty and obligation to indemnify the state against any loss or losses by reason of its legislative guaranty to the United States, and afterward received and accepted a patent for the 4,000 acres of land; that it neglected, failed and omitted to keep up and maintain the bridge in good condition and repair, but allowed and suffered it to rot, decay, and become unsafe, and finally to fall into the river, a total wreck, and that since then it had failed, neglected and omitted to reconstruct and rebuild the bridge.

The question is raised by the motion of the respondent, which is equivalent to a demurrer to a petition in an ordinary

action, whether, under the joint resolution of congress, the act of the legislature of February 26th 1867, and the facts recited, any duty has been omitted which can be enforced by a writ of mandamus against the company. The question to be decided is, not whether the state is entitled to relief from the unfortunate position in which it is liable to be placed by the failure of the respondent to keep up and maintain the bridge over the Republican river in a good condition, but whether it is entitled to the relief demanded, that is, a writ of mandamus to have the bridge rebuilt and forever kept in repair.

A writ of mandamus may only issue to an inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins as a duty, resulting from an office, trust, or station, (civil code, § 688, as amended laws 1870, ch. 87, p. 28,) and may not issue in such cases where there is a plain and adequate remedy at law. (Code, § 689.) Now if there is a specific duty imposed by law upon the respondent, resulting from an office, trust, or station, and no other adequate or specific remedy is provided for its enforcement, the writ of mandamus may be granted in this case; but if no such duty is enjoined, or if, being enjoined, there is another adequate remedy, then the writ does not lie. As the object of the bridge company, under its charter, was the erection of a toll-bridge, there is no obligation, either imposed or assumed, on the part of the corporation, within the terms of its charter, to maintain forever a bridge of the character named in the application before us. It cannot be said in this case, that the state may proceed by mandamus to compel the company to rebuild on the ground that the company, having entered upon the exercise of its charter franchises, owes a duty to the public which it cannot, at its caprice, abandon. It is conceded by the learned counsel for the state, that the charter of this company is permissive, and not obligatory; that the company could build the bridge or not, at its election; that the mere exercise of a permissive right to build the bridge would not create the legal duty to maintain it forever; and that the company is not precluded

by anything in its charter from abandoning its franchise. at any time. If then, this action cannot be maintained under authority to compel the company to exercise its corporate powers originally granted or obtained by its charter, the significant query is at once suggested, what duty is specially enjoined, which has been omitted? Counsel for the state say the bridge in question was built under the act of the legislature of 26th February 1867, and not under its original charter. This is true; and we turn to that act to ascertain the specific duties, if any, commanded to be performed. They were, *first*, to complete the bridge within one year from the date of the approval of the law; *second*, to notify the governor of the state immediately of its completion; and *third*, to deposit with the governor satisfactory surety and guaranties, fully indemnifying the state against any loss or losses by reason of the guaranty given by the state to the United States. All these duties were promptly and fully complied with. in 1867, to the satisfaction of the governor of the state; and there is, no special duty left undone expressly enjoined by the said act.

The counsel for the state argue, however, that the acceptance of the act of 26th February 1867, by the bridge company, carried with it the implied agreement or understanding that the company would keep the bridge constructed by it in repair for all time. Admit that this was the expectation of the law-makers; yet they thought fit to protect the state's interests only by a personal bond. A part of the land might have been retained as security; or a lien for repairs of the bridge might have remained upon the land for all time; and in other ways indemnification could have been amply secured. The state however deemed it advisable to accept a personal bond as its sole security; and the only relation the bridge company sustained to the state, arising upon the bond, is purely a contract relation, for the violation of which there is an adequate remedy at law. We look in vain through the charter of the company, the joint resolution of congress, and the act of 1867, for any duty unperformed, specially enjoined

by law, resulting from an office, trust, or station. Even the implied obligation was secured, or attempted to be secured, by a penal bond, which, when taken, was acceptable. Under this view, there is no legal duty existing which can be enforced by a writ of mandamus. That the venture taken by the state is likely to prove unprofitable; that the means furnished by congress to build and maintain the bridge are exhausted; that the lands have been divided up and sold to *bona fide* holders; that the bridge is now a wreck, and useless; that the bond of indemnity is probably worthless, and that the state may be required to make good its legislative guaranty of 1867, are strong arguments of the recklessness and improvidence of the legislation which culminated in conferring upon the defendant the vast estate of lands it received; but these facts in no way establish any principle, or make plain any duty, upon which the relief prayed for can be granted. That the action of the legislature in 1867 was unusually hasty and inconsiderate, is evidenced by the mere statement, that the law providing for the transfer to a private corporation of all the valuable lands granted to the state to aid in building and maintaining a bridge over the Republican river, was approved on the 26th of February 1867, and the joint resolution of congress, making the grant of these lands, and upon which the action of the state was taken, was not approved until four days thereafter, to-wit, March 2d. As soon as the vote had been taken at Washington upon the joint resolution, the special act of 1867 was hurried through our legislature. That body was so anxious to give to the defendant these lands, upon the terms of the said act, that it did not defer action till the resolution of congress was formally approved by the president. That such indecent haste should finally result in trouble, vexation, and perhaps disaster to the state, is neither unexpected nor startling. A mere recitation of the facts of this case affords a seeming verification of the scriptural proverb, "They who sow the wind, shall reap the whirlwind."

If we adopt the conclusion which has been suggested, that

instead of the relation between the state and the bridge company being one purely of contract, special powers or franchises were bestowed upon the defendant by the special act of 1867, which it is the right of this court to enforce to the full extent of compelling the company to rebuild and maintain forever the bridge, then we are met by the insurmountable barrier, that special acts of our legislature conferring corporate powers are forbidden and void. (Art. 12, § 1, State Const.) "A power that would not be a corporate power when exercised by an individual, becomes a corporate power when exercised by a corporation." *Gilmore v. Norton,* 10 Kas. 491. Viewing the case in the most favorable aspect we can for the state, and assuming the act of 26th February 1867, in regard to the rights conferred on the defendant, was valid, we have nothing between the state and the company, as a security for the protection of the former, but the obligation of the latter, given in pursuance of section 4 of said act of 1867; and as obligations arising upon contract merely, and involving no trust, cannot be enforced by mandamus, 'the motion of the respondent must be sustained, and this action dismissed.

All the Justices concurring.